*still hiring attorney*

New Jersey Bankruptcy Court

Newark NJ

Reopened for damage for fraud of Archer   lack of Due process

For  5th amendment taking clause  As my NJ home of 25 years

Was sold  june  29 2018  based on Fraud with  no due process   and the NJ homeowner did not

Get one penny from the    fraud sale   Docket  17-17032

Reopened the  Involuntary bankruptcy  as  the Law firm

The  3 liens that Archer put on Doctor home  were paid years before

The  Filing of Involuntary bankruptcy

Archer  law firm was paid $55.00o for attorney fees in 2013 2014

When they  quit based on   legal  fee  dispute they refused to provide

 Legal billing ledger and they refused to participate with Arbitration  NJ SA 202.12

Peter  tills esq was my attorney for the NJ board  matters was paid $35.000 thousand

Dollars  for legal fees   Peter  till did not  provide any legal writing   Just  poetry.

Dentist  Louis  Galiano  was paid $7000.00  for  tooth extraction.

Each of these fee disputes were never litigated in  NJ  courts

  The Law firm Archer  committed breach of contract  breach of attorney

 Client privaledge   and breach of Fidicuary Duty and then Fraud

David wolfe  breached  his fidicuary  ethics as t he NJ home was in bankruptcy  Foreclosue

 For  3 months behind

My NJ home was  illegally sold below Market value of $1.525993.00 on June  29  2018

There was no hearing  and David wolfe and   Weichert illegally shredded the patients  charts

 In doctor home   when they  I required based on NJ statutes  Federal rules   not to shred the

Patient charts  Medical doctor in Doctor Home in Foreclosure 303  rule

They breached the bankruptcy Rule 313  and legally they should compensate each patient

For the illegal shredding of Patient charts in  Doctor home   The HIPPA breach of Davi d wolfe

And Weichert Realtor     requires then to pay each patient $50.000 for that breach of Rules

And  they illegally shredded patient charts in Doctor home

Bankruptcy Rule 303. States that  when the NJ  bankruptcy judge lifts the bankruptcy

Without consent of Al parties the  NJ home owner is  legally entitle to punitive damages

And legal fess   The HuD statement is pending   The bank employee  citizen bank

Provided the David wolfe truste report  for the NJ home sale   368 Ridgewood Ave glen Ridge

All the entry are fraud.

1    NJ statues that the truste Davi wolfe is only entitled to $55.000 based on statutes
     There fore the $80.000   that he illegally paid  his company is NJ home  equity theft

2  David  Wolfe and   Alma biling illegally shredded charts   thee NJ home owner

   Should pay for their Unlawful shredding  $3663.00 to  be provided to NJ homeowner

3  Peter Tills   being paid again is also Fraud $188.00o to be provide to NJ home owner

4  archer Griener  being paid for  for legal fee again is also  fraud $55.000

6  Doctor Cheryl Ackerman MD  paid the Real estate taxes while the NJ home in foreclosure

7  ' GAR BARGE DISPOSAL ALSO  FRAUD  DEDUCTION $27.000 THOUSAND DOLLARS

   So David Wolfe provided    real estate tax refund of $18.000 thousand

Since the NJ home Glen Ridge of 25 years legally the  Judgement  to be vacated

And  The NJ homeowner is  legally entitled to the Market value of NJ home

At the time of sale Tyler vs Henderson case law  202 caselaw  Realtor vs Robert

Where the NJ supreme court Judges  are in align with Tyler v  Henderson

And  provide NJ home equity at the  time of Foreclosuse sale 2018

The NJ market value of My NJ home of 25 years   $1.525.993.00     see realtor market value

Appraisal based on Size of property 8 tenth of acre 21 sinks 6 bedroom

The NJ home equity at the time of NJ homes sale is $1.525.653.000

Which is legally due to NJ home owner of 25 years   whose home and office

Was taken by Fraud and lack of Due process

This   Motion is ask Judge Hall to vacate the fraud sale with lack of due process

And provide the NJ homeowner of 25 years   Dr cheryl ackerman MD with 2 children

The NJ home equity in the NJ home. TO PLEASE PROVIDE TO THE NJ HOMEOWNER OF 25 YEARS

The other damages that Doctor Cheryl Ackerman MD is legally entitled to

Punitive damages for bad faith involuntary bankruptcy filing based on Fraud

With no due process that Destroyed the Patient medical chart and Doctor practice

Of 25 years therefore affecting my livelihood to support my fa

The Other damages from this involuntary bankruptcy

Is that Doctor Cheryl Ackerman MD suffered a heart infarcation in NJ bankruptcy courts

And then required emergency cardiac surgery for critical aortic stenosis

Then    my step father Marvin Flashner    when drunk on October 31 2017

Beat daughter in the chest 5 days after cardiac surgery. With pleading to the Judges

The NJ district court Judge Kevin Mcnaulty     did not provide a stay

For the Serious Cardiac issues during this proceeding MY LIFE WAS CUT SHORT

FROM THIS TRAUMATIC EVENT

NJ PREVIOUS HOME OWNER OF 25 YEAR IS CALLING ATTOREY FOR REPREENTATION

FOR THIS MATERS

IN SUMMARY MY NJ HOME OF 25 YEARS WAS ILEGALLY SOLD WITH FRAUD AND LACK OF

DUE PROCESS AND THE NJ HOMEOWNER DID NOT ANY EQUITY FROM THIE FRAUD SALE

THE FEDERAL CASE LAW TYLER STATES THAT RETROACTIVELY THE NJ HOME OWNER

IS LEGALLY ENTITLED TO THE NJ HOME EQUITY AT THE TIME OF SALE JUNE 29 2018

BANKRUPT CASE LAW NJ 303 AS THE PARTIES DID NOT CONSENT

LEGALLY THE NJ HOMEOWNER IS DUE PUNITIVE DAMAGES AND LEGAL FEESS

THE Legal malpractice of archer Griener which is very obvious

Breach of contract see email when the attorney quit when Client with cardiac disability

Breach of fiicuary duty breach of attorney Client privaledge and the privaledge belongs

To client and then Fraud

T

Asking the Bankruptcy judge to provide damages

From NJ home equity theft june 29 2018

as the NJ home Glen Ridge 368 Ridgewood June 29 2018 tolling the statutes

for NJ vicitm of assault and battery. With Cardiac disability

Of 25 years mother and 2 children is legally entitled to

NJ home equity in the NJ home at the time of sale

And Bankruptcy rule 303 for punitive damages and legal fees

From the Legal malpractice of Archer Griener And David wolfe FOR LEGAL MALPRACTICE

BREACH OF FIDCUARY DUTY

DR CHERYL ACKERMAN MD LICENSED MD NJ

MOTHER WITH 2 CHILDREN GRANDSON







1 of 7

Share Your Feedback



6 bd   6 ba   4,853 sqft
368 Ridgewood Ave, Glen Ridge, NJ 07028
  Sold: $1,025,000   Sold on 06/29/18   Zestim
Est. refi payment: $5,842/mo   $   Refinance your l

Home value    Owner tools    Home details    Neig

## Home value

**Watch your Zestimate**
Do you own this home? Track trends
receive local market insights for hon

**Get homeowner insights**



Zestimate

# $1,525,9



Zestimate ran

**$1.37M - $**



Last 30-day ch

**+$48,886** (



Zestimate per

**$314**

My praious home
tday —
market aalys
$1,525,135,000

market
value
2021

SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**257-261 20th Avenue Realty, LLC v. Alessandro Roberto** (A-29-23) (088959)

**Argued September 23, 2024 -- Decided January 9, 2025**

**RABNER, C.J., writing for a unanimous Court.**

In this appeal, the Court considers whether the version of the Tax Sale Law (TSL) in effect prior to the law's amendment in 2024 violates the Takings Clause of the Fifth Amendment to the United States Constitution.

Defendant Alessandro Roberto bought a property in Paterson in 1997; in 2022, a realtor estimated the property could be listed for up to $535,000. Roberto failed to pay three sewer tax bills on the property totaling $606. The City of Paterson placed tax liens on the property for that amount, and plaintiff 257-261 20th Avenue Realty, LLC, bought the corresponding tax sale certificates at public auction. Years later, plaintiff filed a tax foreclosure complaint. The trial court set the amount of redemption at $32,973.15. Roberto did not answer the complaint or pay the redemption amount, and the court entered a judgment in plaintiff's favor.

Within two months of the final judgment, Roberto moved to permit redemption under Rule 4:50-1, arguing that he had posted $50,000 in escrow to redeem the property; that he had invested about $200,000 in improvements to the property since its purchase; and that, at age seventy-five, the "[p]roperty was crucial to [his] retirement because it ha[d] over several hundred thousand dollars in equity" beyond the amount of past taxes owed. The trial court ultimately vacated the judgment under Rule 4:50-1(f), which allows for judgments to be set aside in exceptional circumstances. Plaintiff appealed.

While the appeal was pending, the Supreme Court decided Tyler v. Hennepin County, 598 U.S. 631 (2023), holding that a homeowner -- faced with forfeiture of the surplus equity in her home under Minnesota's tax foreclosure law -- had plausibly alleged a taking in violation of the Fifth Amendment. The Appellate Division concluded that Tyler provided cause to vacate judgment and affirmed. 477 N.J. Super. 339, 350, 362 (App. Div. 2023). It also held that, under New Jersey precedent, Tyler should be given pipeline -- not full -- retroactivity, and it separately found that the trial court did not abuse its discretion in granting relief under Rule 4:50-1(f). Id. at 363, 368. The Court granted certification. 256 N.J. 535 (2024).

1

**HELD:** The applicable version of the TSL in this case is unconstitutional to the extent it allows for the forfeiture of surplus equity without just compensation. New Jersey recognizes a property right to surplus equity in real property, and because private lienholders act jointly with local government under the TSL to perform a traditional public function -- the collection of taxes -- they may be considered state actors. The Court rejects the argument that the surplus equity initially foreclosed in this case was not taken for a public use. The Court affirms as modified the judgment of the Appellate Division based on the reasoning in Tyler; it does not rely on Rule 4:50-1(f).

1. The Court reviews New Jersey's tax foreclosure law before its amendment in 2024. The statutory amendments have no effect on this appeal. Tyler, however, materially affects the legal issues presented, so the Court does not resolve whether exceptional circumstances within the meaning of Rule 4:50-1(f) were present in this case. It instead notes that Roberto's motion was timely and that it does not adopt the Appellate Division's analysis under the Rule. (pp. 10-18)

2. The Takings Clause of the Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. In Tyler, the Supreme Court evaluated the Takings Clause in the context of the foreclosure of a private home under Minnesota's tax foreclosure scheme. 598 U.S. at 634-35. In doing so, the Supreme Court looked to state law, traditional property law principles, historical practice, and precedent. Id. at 638. The Tyler Court noted that Minnesota recognized a homeowner's right to equity in real property. Ibid. As a result, although "[t]he County had the power to sell Tyler's home to recover the unpaid property taxes[,] . . . it could not . . . confiscate more property than was due" -- a principle traced back to the Magna Carta. Id. at 639. The Tyler Court also considered other contexts in which Minnesota law recognized that "a property owner is entitled to the surplus in excess of her debt." Id. at 645. The Court explained that "[t]he Takings Clause 'was designed to bar Government from forcing some people alone to bear public burdens.'" Id. at 647. Under the facts of Tyler's case, "[a] taxpayer who loses her $40,000 house to the State to fulfill a $15,000 tax debt has made a far greater contribution to the public fisc than she owed." Ibid. (pp. 18-21)

3. As binding precedent of the United States Supreme Court, Tyler applies to pending federal cases on direct review, Harper v. Va. Dep't of Tax'n, 509 U.S. 86, 97 (1993), and to cases on direct review in state court, Reynoldsville Casket Co. v. Hyde, 514 U.S. 749 (1995). This case is not final; it is still pending. The Court therefore agrees with the Appellate Division that Tyler applies here, but it reaches that conclusion because Harper and Reynoldsville so require, not based on a retroactivity analysis under New Jersey precedent. And because Roberto's claim is on direct review, the Court does not address the Appellate Division's determination that Tyler should not receive full retroactivity in other cases. Nor does the Court

2

decide whether a party may file a claim for just compensation alone when a foreclosure has been finalized and a taking of equity has already occurred, but the taking is within the relevant statute of limitations. (pp. 21-25)

4. Plaintiff contends Tyler should not apply to New Jersey's tax foreclosure scheme. First, plaintiff argues that New Jersey did not recognize a protected property right to surplus equity when the equity in Roberto's property was taken. The Court reviews the historical and traditional legal principles relating to surplus equity, as the Supreme Court did in Tyler, and concludes that property owners in New Jersey do have a recognized property right to surplus equity. Plaintiff next argues that private lienholders are not state actors, so their conduct is not subject to the Takings Clause. But the collection of tax revenue is a quintessential, traditional public function. Real estate taxes are the primary source of revenue for local governments. Lienholders on their own cannot facilitate the collection of delinquent property taxes or create an alternate stream of revenue for the town under the TSL; nor can they transfer title through a tax foreclosure. Local government and private lienholders act jointly in that regard. And their interdependent actions flow from the statutory scheme the State created -- the TSL. Private lienholders who execute tax foreclosures may thus be considered state actors. Finally, plaintiff argues that any equity foreclosed in this case was not taken for a public use and would therefore not run afoul of the Fifth Amendment. The argument is self-defeating because even if a lienholder took surplus equity in property for a private use, they could not keep it. In any event, the TSL does serve a public purpose: it enables municipalities to collect taxes for the public's general welfare; it is not a taking for a private purpose. And other recent rulings have applied Tyler in similar situations. (pp. 26-33)

5. The version of the TSL in effect before 2024 runs counter to the principles outlined in Tyler and violates the Takings Clause of the Fifth Amendment. The Takings Clause, by its very terms, is designed to prevent the taking of "private property . . . for public use, without just compensation." U.S. Const. amend. V. As a result, lienholders are entitled to recover debts they are owed -- the value of tax sale certificates they purchased at public auction along with interest and related costs. But they are not entitled to surplus equity in property that exceeds that amount. To the extent the prior version of the TSL deviates from those principles, it does not survive constitutional scrutiny. Property owners challenging a tax foreclosure on direct review therefore have a plausible claim for the value of property taken from them beyond the debt they owe. (pp. 33-34)

**AFFIRMED AS MODIFIED.**

**JUSTICES PATTERSON, WAINER APTER, FASCIALE, and NORIEGA join in CHIEF JUSTICE RABNER's opinion. JUSTICE PIERRE-LOUIS did not participate.**

3

## SUPREME COURT OF NEW JERSEY
### A-29 September Term 2023
### 088959

257-261 20th Avenue,
Realty, LLC,

Plaintiff-Appellant,

v.

Alessandro Roberto,

Defendant-Respondent,

and

Fanny Roberto, wife of
Alessandro Roberto, Keller
Depken Fuel Oil Company Inc.,
a/k/a Hop Energy LLC, and
Midland Funding LLC,

Defendants.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
477 N.J. Super. 339 (App. Div. 2023).

| Argued | Decided |
|---|---|
| September 23, 2024 | January 9, 2025 |

Elliott J. Almanza argued the cause for appellant
(Goldenberg, Mackler, Sayegh, Mintz, Pfeffer, Bonchi &
Gill, attorneys; Elliott J. Almanza and Keith A. Bonchi,
of counsel and on the briefs).

1

Glenn R. Reiser argued the cause for respondent (Shapiro Croland Reiser Apfel & Di Iorio, attorneys; Glenn R. Reiser and Ilan S. Danon, on the briefs).

Russell M. Finestein argued the cause for amicus curiae New Jersey Land Title Association (Finestein & Malloy, attorneys; Russell M. Finestein, Michael D. Malloy, and Daniel L. Finestein, on the brief).

Adam D. Greenberg argued the cause for amicus curiae National Tax Lien Association, Inc. (Honig & Greenberg, and Law Offices of Gary C. Zeitz, attorneys; Adam D. Greenberg and Robin London-Zeitz, on the brief).

Christina M. Martin of the Washington, Oregon, and Florida bars, admitted pro hac vice, argued the cause for amicus curiae Pacific Legal Foundation (Pacific Legal Foundation, attorneys; Jonathan M. Houghton, Christina M. Martin, and David J. Deerson of the California bar, admitted pro hac vice, on the brief).

Maryann Flanigan Sutherland argued the cause for amicus curiae Legal Services of New Jersey (Legal Services of New Jersey, attorneys; Maryann Flanigan Sutherland, Dawn K. Miller, Robert Casagrand, Rebecca Schore, Jeremy Silberman, and David McMillin, on the brief).

Jean P. Reilly, Assistant Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Jean P. Reilly, of counsel and on the brief, and Jonathan B. Peitz, Assistant Attorney General, and Michelline Capistrano Foster, Mark Fischer, Valerie Hamilton, James Robinson, Chandra M. Arkema, Judith M. O'Malley, Timothy Kawira, and Linzhi Wang, Deputy Attorneys General, on the brief).

Lisa M. Leili submitted a brief on behalf of amicus curiae Invest Newark (Porzio, Bromberg & Newman, attorneys;

2

Lisa M. Leili and Rahool Patel, of counsel and on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

In this appeal, we consider whether the Tax Sale Law (TSL), N.J.S.A. 54:5-1 to -137, violates the Takings Clause of the Fifth Amendment to the United States Constitution. We evaluate the version of the law in effect before it was amended in 2024. L. 2024, c. 39.

When property owners fail to pay taxes on property they own, municipalities can sell that debt at public auction under the TSL. The successful purchaser, in effect, pays the taxes due and has the right to seek to foreclose and acquire title to the property subject to various requirements. The owner, however, can redeem the property for the value of the debt plus interest and costs up until the entry of final judgment.

In this case, defendant Alessandro Roberto owned a mixed-use commercial and residential property. He failed to pay $606 in sewer tax bills, and plaintiff 257-261 20th Avenue Realty, LLC (20th Avenue Realty), purchased that debt pursuant to the TSL.

Years later, plaintiff filed a lawsuit to foreclose on the property. At the time, the redemption amount was approximately $33,000. Because Roberto did not respond or redeem the property, a default judgment was entered. As a

3

result, Roberto stood to lose his ownership interest in the property. It is undisputed that the property was worth considerably more than the accumulated debt at the time -- possibly as much as $500,000 more.

The trial court ultimately vacated the judgment under Rule 4:50-1(f), which allows for judgments to be set aside in exceptional circumstances. The Appellate Division upheld that ruling.

While the appeal was pending, the United States Supreme Court decided Tyler v. Hennepin County, 598 U.S. 631 (2023). The Court in Tyler held that a homeowner -- faced with forfeiture of the surplus equity in her home under Minnesota's tax foreclosure law -- had plausibly alleged a taking in violation of the Fifth Amendment. Id. at 639, 647. The Appellate Division therefore concluded that Tyler provided a basis to vacate the judgment.

We hold that the applicable version of the TSL in this case is unconstitutional to the extent it allows for the forfeiture of surplus equity without just compensation. Certain principles underlie that holding. We find that New Jersey recognizes a property right to surplus equity in real property. We also conclude that because private lienholders act jointly with local governments under the TSL to perform a traditional public function -- the collection of taxes -- they may be considered state actors. And we reject the argument that the surplus equity initially foreclosed in this case was not taken

4

for a public use. Under settled law, it could not have been taken for a private use. Plus, takings under the TSL are not for private use; they are designed to raise revenue for municipalities to operate.

We therefore affirm as modified the judgment of the Appellate Division based on the reasoning in Tyler. We do not rely on Rule 4:50-1(f).

I.

A.

Defendant Alessandro Roberto bought a mixed-use commercial and residential property in Paterson in 1997. In 2022, it consisted of two residential apartments, a carwash, an auto mechanic's shop, and two vacant stores.

The record includes an uncertified comparative analysis report prepared by a local realtor in or about 2022. The report suggested listing the property at $475,000 to $535,000. The property was not encumbered by a mortgage.

Roberto failed to pay three sewer tax bills on the property: two bills in 2010 in the amount of $226.57 and $88.24, and a third in 2016 in the amount of $291.19. The three unpaid bills totaled $606, and the City of Paterson placed tax liens on the property for that amount. Plaintiff bought three corresponding tax sale certificates at public auction in 2010 and 2016. The trial court observed that "plaintiff apparently also paid other taxes and

5

potentially some other charges along the way." The record contains no details about additional payments other than plaintiff's counsel's representation at oral argument before the trial court.

In June 2021, plaintiff filed a tax foreclosure complaint in Superior Court. Roberto then offered $9,000 to the tax collector's office to try to redeem the property. Because Roberto owed more than that amount, his offer was declined. In response to plaintiff's request, the trial court later set the amount of redemption at $32,973.15 and the deadline to redeem on December 21, 2021. Roberto neither answered the complaint nor paid the redemption amount, and the court entered a final judgment in plaintiff's favor on February 2, 2022.

In the days that followed, Roberto filed for bankruptcy and also sought to void the final judgment in bankruptcy court. That case was later dismissed. On April 1, 2022, within two months of the final judgment, Roberto moved before the Superior Court to vacate the judgment, permit redemption under Rule 4:50-1(e) and (f),[1] and restore title to the property.

---

[1] As discussed further below, Rule 4:50-1 provides, in part, that "the court may relieve a party . . . from a final judgment or order for the following reasons: . . . (e) . . . it is no longer equitable that the judgment or order should have prospective application; or (f) any other reason justifying relief from the operation of the judgment or order."

6

In support of his motion, Roberto argued that he had posted $40,000 in escrow with his attorneys to redeem the property and intended to post an additional $10,000. (He did so before the hearing.) He noted that he paid $26,000 for the property in 1997 and invested about $200,000 in renovations and improvements since then.

Roberto explained that he "lost substantial income from [the p]roperty because of [his] tenants' failure to pay rent" "[d]ue to the Covid-19 global pandemic," which prevented him from redeeming the tax sale certificates. He asserted that one tenant had failed to pay $9,600 and a second owed $15,000. He added that, at age seventy-five, the "[p]roperty was crucial to [his] retirement because it ha[d] over several hundred thousand dollars in equity" beyond the amount of past taxes owed.

Plaintiff opposed the motion. Among other things, plaintiff disputed the impact of Covid and pointed to rental payments made by, or on behalf of, tenants. Roberto, in turn, conceded that "Covid was not the cause of this . . . but it didn't help . . . the situation."

The trial court found the case was "exceptional" and "warrant[ed] relief under Rule 4:50-1(f)." The court observed that when "owners hold substantial equity in . . . property, the system can be Dickensian." In this case, the court noted, Roberto had "put up" the money to redeem, and the property had "very

7

substantial equity relative to the lien." The trial judge did not rely on the effect of Covid; it found that "Covid may or may not have had an impact" on Roberto's ability to collect rents. Under the totality of the circumstances, the court concluded "it would be inequitable . . . to allow a forfeiture of such significant equity for a seventy-five-year-old man."

The court's ruling to vacate final judgment had several conditions: Roberto had to pay the full redemption amount as well as $12,400 in attorney's fees and costs within forty-five days. The court did not grant relief under Rule 4:50-1(e).

Roberto complied with the conditions and, on June 13, 2022, regained title to the property.

B.

Plaintiff appealed. While the appeal was pending, the United States Supreme Court decided Tyler. In that case, a county government seized a tax-delinquent home under Minnesota's tax foreclosure law. 598 U.S. at 635. After a foreclosure sale, the county kept the equity in the home above the amount of the debt. Ibid. The Supreme Court found that the forfeiture of the homeowner's surplus equity plausibly "stated a claim under the Takings Clause" of the Fifth Amendment that entitled her to just compensation. Id. at 639, 647.

8

C.

The Appellate Division affirmed the trial court's judgment. 257-261 20th Ave. Realty, LLC v. Roberto, 477 N.J. Super. 339, 350 (App. Div. 2023). It concluded that the decision in Tyler provided cause to vacate judgment, id. at 350, because New Jersey's Tax Sale Law, like Minnesota's scheme, "permit[s] foreclosure of a property owner's equity" "above the lien amount owed," "and is thus a prohibited taking after Tyler," id. at 362.

The appellate court rejected the notion that Tyler does not apply to third-party purchasers like plaintiff. Id. at 365. The court explained that "[t]he government cannot confer to a third-party" a greater recovery than the public entity itself is entitled to. Id. at 365-66. The court also found that the State Constitution provides greater protection to property owners than the United States Constitution does. Id. at 365 (citing N.J. Const. art. I, ¶ 20).

The Appellate Division concluded that Tyler should be given pipeline retroactivity, not full retroactivity. Id. at 363. It reasoned that "full retroactivity would be unworkable and create a substantial hardship for taxing authorities" and third-party purchasers alike. Ibid.

The Appellate Division separately found that the trial court did not abuse its discretion when it granted relief under Rule 4:50-1(f). Id. at 368. The

9

court noted the trial judge had balanced the equities and acted within its "sound discretion, based on the totality of [the] facts." Id. at 369.

D.

We granted plaintiff's petition for certification. 256 N.J. 535 (2024). We also granted leave to participate as friends of the court to the Attorney General, the New Jersey Land and Title Association (NJLTA), and Invest Newark. Legal Services of New Jersey, the Pacific Legal Foundation, and the National Tax Lien Association, Inc. (NTLA) first appeared as amici curiae in the Appellate Division and have remained in the case. See R. 1:13-9(d).

II.

A.

To provide relevant background information, we begin with a summary of New Jersey's tax foreclosure law before it was amended in 2024.

In New Jersey, local "governments depend on real estate taxes and other" assessments related to real property "as their primary sources of revenue." Simon v. Cronecker, 189 N.J. 304, 318 (2007). The State's tax foreclosure law provides a framework for towns to collect a stream of revenue when property owners do not pay their taxes. See ibid.; Varsolona v. Breen Cap. Servs. Corp., 180 N.J. 605, 621-22 (2004).

10

New Jersey has had a form of tax sale foreclosure since at least the late nineteenth century under the Martin Act, L. 1886, c. 112. See State v. City Council of Camden, 50 N.J.L. 87, 97 (Sup. Ct. 1887); Burgin v. Rutherford, 56 N.J. Eq. 666, 669-70 (Ch. 1898). The original Tax Sale Law, enacted in 1918, was designed "to revise the procedure for tax sales" and "provide a uniform and simple procedure" for municipalities to collect property taxes. In re Princeton Off. Park, LP v. Plymouth Park Tax Servs. LLC, 218 N.J. 52, 62 n.3 (2014) (quoting Sponsor's Statement to A. 52 (L. 1918, c. 237)).

Under the TSL, unpaid property taxes create a continuous lien on a property for taxes owed, "subsequent taxes . . . , interest, penalties and costs of collection." N.J.S.A. 54:5-6. The TSL enables municipalities to "convert[] that lien into a stream of revenue by encouraging the purchase of tax certificates on tax-dormant properties." Cronecker, 189 N.J. at 318 (citing N.J.S.A. 54:5-19, -31 to -32). To accomplish that, towns can "issue a certificate certifying the taxes" and other obligations tied to the lien. N.J.S.A. 54:5-11, -12. Towns may then sell the certificate at auction after notice to the public and the property owner. N.J.S.A. 54:5-19, -26, -27, -31. Potential buyers can start the bidding at a maximum interest rate of 18 percent; the certificate is sold to the bidder willing to buy it at the lowest rate. N.J.S.A. 54:5-32.

11

The successful bidder "agrees to pay . . . the municipality the taxes or assessments due," Cronecker, 189 N.J. at 319 (citing N.J.S.A. 54:5-31, -32, -46), and can "record the certificate . . . 'as a mortgage on the land,'" ibid. (quoting N.J.S.A. 54:5-50).

The purchase of a tax sale certificate does not convey the property to the buyer. Princeton Off. Park, 218 N.J. at 63. The delinquent owner still has title to the property; the purchaser obtains the municipality's lien. Id. at 63, 67. With that, the purchaser acquires an "inchoate interest [that] consists of three rights: the right to receive the sum paid for the certificate with interest"; "the right to redeem" any later-issued tax sale certificate; "and the right to acquire title by foreclos[ure]." Varsolona, 180 N.J. at 618.

Property owners can redeem a tax certificate by paying the amount tendered at the sale, the buyer's expenses, and subsequent taxes with interest. N.J.S.A. 54:5-58 to -60. The municipal taxing authority sets the amount required for redemption, and all redemptions must "be made through the tax collector's office." N.J.S.A. 54:5-54, -54.1.

If the property owner does not redeem, the purchaser of the certificate can file an action in court "to foreclose the right of redemption." N.J.S.A. 54:5-86(a). The lawsuit can be filed from two to twenty years after the date the certificate was sold. N.J.S.A. 54:5-79, -86(a). The purchaser must give

12

the owner thirty days' written notice of the action, N.J.S.A. 54:5-97.1, -98, and the owner can still redeem at any time before the right to redeem is cut off or final judgment is entered, N.J.S.A. 54:5-54; R. 4:64-6. Once the court enters final judgment, title to the property "vest[s] in the purchaser." N.J.S.A. 54:5-87.

B.

After we granted certification, the Legislature amended the state's tax foreclosure laws in response to Tyler. L. 2024, c. 39. Among other changes, property owners facing tax foreclosure can now take steps to preserve their equity in property being foreclosed. See N.J.S.A. 54:5-87(b) (2024). Owners can demand a judicial sale or internet auction and seek to have any surplus funds from the sale returned to them. Ibid. If no one bids on a property and the tax sale certificate holder gets title, it is "presumed that there is no equity in the property." Ibid. And if the owner does not demand a judicial sale or internet auction, the new law states that the owner "shall have no claim against the holder of the tax sale certificate for any equity in the property." Ibid.

Governor Murphy signed the new law on July 10, 2024. A. 3772 (2024). The statute provides that it "shall take effect immediately" and "shall have no effect on any foreclosure action in which a final judgment has been entered prior to the effective date of this act." L. 2024, c. 39, § 11. We asked for

13

additional briefing on the new law and note that it has no effect on this appeal. For that reason, we do not reach Roberto's argument that the revised law is still unconstitutional.

### III.

Plaintiff 20th Avenue Realty argues there are no exceptional circumstances that justify relief under Rule 4:50-1(f). Plaintiff also contends that Tyler does not apply to the TSL for three reasons: (1) no property right to surplus equity exists in New Jersey; (2) a private lienholder is not a state actor; and (3) "there is no 'public purpose' when it comes to tax foreclosure." Plaintiff, supported by the NTLA and NJLTA, also raises various policy concerns. Together, they submit that the Appellate Division's ruling will jeopardize the stability of title insurance, decrease the likelihood of tax foreclosures, and undercut the ability of municipalities to generate tax revenue.

Defendant Roberto maintains the trial court did not abuse its discretion when it vacated final judgment under Rule 4:50-1(f). He also claims that the TSL is unconstitutional in the wake of Tyler because the law allows for the forfeiture of a property owner's equity without just compensation.

The Pacific Legal Foundation and Legal Services of New Jersey argue in support of defendant's position. Pacific Legal Foundation submits that Tyler applies to New Jersey as much as Minnesota, and that private lienholders are

14

liable as state actors because of their role in the foreclosure scheme. Legal Services of New Jersey similarly asserts that New Jersey recognizes a property right in surplus equity, and that the TSL deprives property owners of their constitutional rights.

Invest Newark raises issues about vacant, abandoned, and deteriorating properties in the wake of Tyler.

The Attorney General takes no position on whether Tyler applies to the TSL. If it does, the Attorney General argues, that conclusion should not extend to abandoned properties. The Attorney General also contends that only the party foreclosing should be required to pay any compensation due; in other words, non-foreclosing municipalities should not be required to reimburse surplus equity they never obtained.

The parties and amici also debate whether and to what extent Tyler should apply retroactively.

IV.

As we discuss later, the Supreme Court's decision in Tyler materially affects the legal issues in this appeal. We therefore address only briefly plaintiff's argument that the trial court abused its discretion when it vacated judgment under Rule 4:50-1(f).

15

The Rule provides that a "court may relieve a party . . . from a final judgment or order" for various reasons, including "any . . . reason justifying relief from the operation of the judgment or order." R. 4:50-1(f).  Whether to grant relief "is left to the sound discretion of the trial court," Mancini v. EDS ex rel. N.J. Auto. Full Ins. Underwriting Ass'n, 132 N.J. 330, 334 (1993), and that decision is reviewed for abuse of discretion, U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467 (2012).

"[R]elief . . . is available only in 'exceptional circumstances.'" Hous. Auth. of Morristown v. Little, 135 N.J. 274, 290 (1994) (quoting Baumann v. Marinaro, 95 N.J. 380, 395 (1984)).  And the Rule's "boundaries 'are as expansive as the need to achieve equity and justice.'" Ibid. (quoting Palko v. Palko, 73 N.J. 395, 398 (1977)).  Nonetheless, "vacation of a judgment . . . should be granted sparingly." In re Guardianship of J.N.H., 172 N.J. 440, 473-74 (2002).

To decide whether to vacate judgment under the Rule, courts consider, among other equitable factors, the extent of the delay in applying for relief, the applicant's fault or blamelessness, and any prejudice to the other party. Id. at 474. "[T]he strong interests in finality of judgments and judicial efficiency," Guillaume, 209 N.J. at 467 (quoting Mancini, 132 N.J. at 334), are also balanced against "the need to achieve equity and justice," J.N.H., 172 N.J. at

16

474. In the end, whether exceptional circumstances exist depends on the facts of each case, and all "doubts . . . should be resolved in favor of the parties seeking relief." Mancini, 132 N.J. at 334.

Several sources provide relevant time limits for the Rule. In general, motions under Rule 4:50-1 must be made "within a reasonable time." R. 4:50-2 (specifying that motions under sections (a), (b), and (c) of Rule 4:50-1 must be made "not more than one year after the judgment"). The TSL separately sets a three-month time limit to apply to reopen a final judgment. N.J.S.A. 54:5-87.

Roberto filed his motion to vacate judgment within two months. Under any of the above measures, his motion was timely.

Whether exceptional circumstances were present in this case, however, is a closer question. The trial judge considered in particular the substantial amount of surplus equity in the property. Roberto owed approximately $33,000 in delinquent taxes, interest, and costs. Yet he may have had hundreds of thousands of dollars in additional equity in the property. As we discuss next, however, that concern is properly addressed by Tyler.

The Covid-19 pandemic did not factor into the equitable analysis because, as the trial court found, it "may or may not have had an impact" on Roberto's ability to collect rents.

17

Roberto also points to the fact that he placed $50,000 in escrow with an attorney to redeem the property. Plaintiff contends that cannot amount to an exceptional circumstance because, in order to redeem property under the TSL, an owner must be able to pay the outstanding amount of tax due plus interest and costs.

Under the circumstances, we need not resolve the dispute. We instead note that Roberto's motion was timely and that we do not adopt the Appellate Division's analysis under Rule 4:50-1(f). See Roberto, 477 N.J. Super. at 368-70.

Following the trial court's decision to vacate judgment, this matter was on direct review before the Appellate Division when the Supreme Court decided Tyler. We therefore need to consider the import of Tyler, which we turn to now.

## V.

### A.

The Takings Clause of the Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The Clause applies to the States through the Fourteenth Amendment. Tyler, 598 U.S. at 637; Chicago, Burlington & Quincy R.R. v. Chicago, 166 U.S. 226, 236-37 (1897).

18

In Tyler, the Supreme Court evaluated the Takings Clause in the context of the foreclosure of a private home under Minnesota's tax foreclosure scheme. 598 U.S. at 634-35. Geraldine Tyler, who was ninety-four years old, owned a one-bedroom condominium in Minneapolis when her family moved her to a senior community. Id. at 635. In her absence, no one paid $2,300 in property taxes due on the home. Ibid. With interest and penalties, the debt grew to $15,000 over five years. Ibid. Under Minnesota's tax forfeiture law, Hennepin County seized the condo and sold it for $40,000 to satisfy Tyler's debt. Ibid. The County kept the surplus equity of $25,000. Ibid.

Tyler sued in federal court and brought a claim under the Takings Clause. Id. at 635-36. The Supreme Court concluded she had "stated a claim under the Takings Clause and [was] entitled to just compensation." Id. at 639. At the core of its analysis, the Court explained "that a government may not take more from a taxpayer than she owes." Ibid.

To assess the question before it, the Court looked to several sources for guidance: state law, traditional property law principles, historical practice, and precedent. Id. at 638. The Court first observed that Minnesota recognized a homeowner's right to equity in real property. Ibid. As a result, although "[t]he County had the power to sell Tyler's home to recover the unpaid

19

property taxes[,] . . . it could not . . . confiscate more property than was due." Id. at 639.

The Court traced that principle back to the Magna Carta. Ibid. It noted that the "doctrine became rooted in English law" and "made its way across the Atlantic" into the law of ten states "shortly after the founding." Id. at 639-40. "[T]oday," the Court observed, "[t]hirty-six States and the Federal Government require that . . . excess value be returned to the taxpayer." Id. at 642.

The Court also reviewed precedents for "the principle that a taxpayer is entitled to the surplus in excess of the debt owed." Ibid.; see United States v. Taylor, 104 U.S. 216, 219, 221 (1881) (finding a taxpayer was entitled to the surplus equity in property sold to pay delinquent taxes); United States v. Lawton, 110 U.S. 146, 149-50 (1884) (same when the federal government kept the property instead of selling it); see also Nelson v. City of New York, 352 U.S. 103, 110 (1956) (noting that the relevant ordinance did not preclude the owner from obtaining surplus proceeds).

In addition, the Supreme Court considered other contexts in which Minnesota law recognized that "a property owner is entitled to the surplus in excess of her debt." Id. at 645. As examples, the Court pointed to private creditors seeking to enforce a judgment by selling a debtor's real property,

20

bank foreclosures, the seizure of private property to pay delinquent income taxes, and the failure to pay taxes on other personal property. Ibid. In each situation, the Court noted, any surplus from the sale of property belonged to the owner. Ibid.

In conclusion, the Court explained that "[t]he Takings Clause 'was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Id. at 647 (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)). Under the facts of Tyler's case, "[a] taxpayer who loses her $40,000 house to the State to fulfill a $15,000 tax debt has made a far greater contribution to the public fisc than she owed." Ibid.[2]

---

[2] Plaintiff contends that Balthazar v. Mari, Ltd., 301 F. Supp. 103 (N.D. Ill.), aff'd, 396 U.S. 114 (1969), demonstrates tax foreclosure schemes like the TSL are constitutional. Balthazar primarily involved a due process challenge to the "sale of tax delinquent real estate" under Illinois law. Id. at 104-05. In a footnote, the district court stated that case law relating to just compensation was "inapplicable." Id. at 105 n.6. The Supreme Court summarily affirmed the district court without issuing an opinion. 396 U.S. 114.

Tyler does not mention Balthazar. To the extent plaintiff argues that the district court's opinion and the Court's summary affirmance are at odds with Tyler, Tyler controls.

21

B.

Tyler, of course, is binding precedent of the United States Supreme

Court. Under the Supremacy Clause, it is the source of authority on the

Takings Clause for federal and state courts alike. Cooper v. Aaron, 358 U.S.

1, 18 (1958) ("Article VI of the Constitution makes the Constitution the

'supreme Law of the Land'" and "the federal judiciary is supreme in the

exposition of the law of the Constitution").

In Harper v. Virginia Department of Taxation, 509 U.S. 86, 97 (1993),

the Supreme Court explained that when it

> applies a rule of federal law to the parties before it, that
> rule is the controlling interpretation of federal law and
> must be given full retroactive effect in all cases still
> open on direct review and as to all events, regardless of
> whether such events predate or postdate our
> announcement of the rule.

Tyler thus applies to pending federal cases on direct review.

Tyler likewise applies to cases on direct review in state court. The

Supreme Court made that clear in Reynoldsville Casket Co. v. Hyde, 514 U.S.

749 (1995).

In Reynoldsville, the Ohio Supreme Court had declined to give effect to

an earlier decision of the United States Supreme Court in Bendix Autolite

Corp. v. Midwesco Enterprises, Inc., 486 U.S. 888 (1988). Bendix found that

22

an Ohio tolling statute impermissibly burdened interstate commerce and was unconstitutional. Reynoldsville, 514 U.S. at 750 (describing Bendix). The Ohio Supreme Court nonetheless continued to apply the statute to pending "tort claims that accrued before that decision." Id. at 750-51. In short order, the United States Supreme Court stated that Ohio's holding "violates the Constitution's Supremacy Clause." Id. at 751. The Court also rejected an "ingenious[]" argument to view the Ohio ruling through the lens of "remedy" instead of "retroactivity." Id. at 752-56.

To evaluate whether Tyler should apply to this appeal, the parties and the Appellate Division, in part, reference case law that considered when new state court rulings should apply retroactively in state court. See Roberto, 477 N.J. Super. at 362-64; Coons v. Am. Honda Motor Co., 96 N.J. 419, 421 (1984) (addressing the retroactivity of a state court ruling that a state law violated the Federal Constitution); see also Salorio v. Glaser, 93 N.J. 447, 463-65 (1983) (same); State v. G.E.P., 243 N.J. 362, 386-89 (2020) (addressing a state court ruling on the scope of expert testimony).

Our case law looks to some of the same principles that federal courts use to decide if decisions should apply retroactively. See State v. Wessells, 209 N.J. 395, 411 n.4 (2012). But those principles do not apply here because "[t]he Supremacy Clause does not allow federal retroactivity doctrine to be

23

supplanted by the invocation of a contrary approach to retroactivity under state law." Ibid. (quoting Harper, 509 U.S. at 100). In other words, when the United States Supreme Court applies a principle of federal law to all cases on direct appeal, state courts are bound by that approach.

This case involves the application of controlling federal law, which the United States Supreme Court applied to the parties before it in Tyler. Harper and Reynoldsville thus require that the law be applied to pending cases on direct review in both federal and state court.

Here, the trial court vacated the final judgment of foreclosure, and plaintiff appealed that ruling. As a result, this case is not final; it is still pending. We therefore agree with the Appellate Division that Tyler applies to this appeal, but we reach that conclusion without conducting our own retroactivity analysis.[3]

---

[3] Because Roberto's claim is on direct review before this Court, we need not determine whether full retroactivity is warranted in other cases. For that reason, we decline to address or adopt the appellate court's analysis of that issue. See Roberto, 477 N.J. Super. at 363. We also do not decide a related question amicus Pacific Legal Foundation has raised:  whether a party may file a claim for just compensation alone when a foreclosure has been finalized and a taking of equity has already occurred, but the taking is within the relevant statute of limitations. See State v. O'Driscoll, 215 N.J. 461, 479 (2013) (noting that, in general, an amicus cannot expand the issues on appeal); State v. Gandhi, 201 N.J. 161, 191 (2010) (same).

24

To assess the parties' arguments and determine whether the taking of Roberto's property was without just compensation contrary to the Fifth Amendment, we therefore consider the principles the Supreme Court articulated in Tyler.

## VI.

Plaintiff contends Tyler should not apply to New Jersey's tax foreclosure scheme for several reasons. We address each in turn.

## A.

A violation of the Takings Clause requires the taking of private property. U.S. Const. amend. V. Plaintiff argues that New Jersey did not recognize a protected property right to surplus equity when the equity in Roberto's property was taken.

As noted earlier, the Supreme Court in Tyler looked to various sources to assess the nature of property rights, including state law. 598 U.S. at 638. The Court found that Minnesota law recognized an owner's right to surplus value in property beyond the value of a debt in various situations: when private creditors sought to enforce a judgment by selling property; in bank foreclosures; for the seizure of property to pay delinquent income taxes; and for the failure to pay taxes on other personal property. Id. at 645. In all those

25

areas, the Court observed that surplus value belonged to the owner under state law. Ibid.

New Jersey, similarly, has long recognized a property right to surplus equity in different contexts. In a civil action for foreclosure or satisfaction of a mortgage, money raised from the sale of the mortgaged property "shall be applied to pay off and discharge the moneys ordered to be paid, and the surplus, if any, shall be deposited with the court and . . . shall be paid to the person or persons entitled thereto, . . . as the court shall determine." N.J.S.A. 2A:50-36, -37 (enacted in 1951) (emphases added). The defendant in a foreclosure action, among other claimants, may apply for the "withdrawal of surplus moneys." R. 4:64-3(a), (b); see also N.J.S.A. 2A:50-37; Danes v. Smith, 30 N.J. Super. 292, 301-02 (App. Div. 1954) (acknowledging that when a "sheriff's sale produced a substantial surplus beyond the mortgage debt," the surplus was "available for distribution according to the respective interests of the parties").

In the commercial context, surplus proceeds must be returned to the debtor after the foreclosure of a security interest. N.J.S.A. 12A:9-608(a)(4), -615(d)(1) (enacted in 2001). And when pawned property is sold at public auction or private sale, any surplus proceeds are due "to the pledgor or anyone

26

else who would have been entitled to redeem the pledge if it had not been sold." N.J.S.A. 45:22-27 (enacted in 1931).

The historical and traditional legal principles relating to surplus equity, which the Supreme Court reviewed in Tyler, as well as prior precedents, are relevant here as well. See Tyler, 598 U.S. at 639-45. As in Minnesota, therefore, property owners in New Jersey have a recognized property right to surplus equity.

### B.

"[M]ost rights secured by the Constitution are protected only against infringement by governments," not private actors. Lugar v. Edmondson Oil Co., 457 U.S. 922, 936 (1982) (quoting Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 156 (1978)). In general, then, under the Fourteenth Amendment, state action is subject to constitutional scrutiny, but private conduct is not. Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001). Here, plaintiff argues that private lienholders are not state actors, so their conduct is not subject to the Takings Clause.

The Supreme Court in Lugar articulated a two-part approach to determine whether actions by a private party may be "fairly attributable to the State":

> First, the deprivation must be caused by the exercise of
> some right or privilege created by the State or by a rule

27

of conduct imposed by the State or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

[Lugar, 457 U.S. at 937.]

More recently, the Court reviewed the state action doctrine and highlighted three distinct circumstances as examples of when a private party can be considered a state actor: "(i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." Manhattan Cmty. Access Corp. v. Halleck, 587 U.S. 802, 809 (2019) (citations omitted).

In light of those principles, the purpose, structure, and practical application of New Jersey's TSL demonstrate that private lienholders who execute tax foreclosures may be considered state actors.

The collection of tax revenue is a quintessential, traditional public function. In New Jersey, like other states, real estate taxes are the primary source of revenue for local governments. Cronecker, 189 N.J. at 318. When property owners fail to make those payments, the TSL, enacted by the State, helps fill the void. It creates a stream of revenue that substitutes for

28

delinquent tax payments. And private lienholders play an integral role in providing that revenue pursuant to the TSL's statutory framework.

Local government and private lienholders have different roles under the statute, which assigns various responsibilities to each. Municipalities, for example, issue and sell tax certificates, and calculate redemption amounts. N.J.S.A. 54:5-11, -12, -19, -31, -54. Lienholders are incentivized to purchase the certificates by a generous maximum interest rate. N.J.S.A. 54:5-32. They determine whether and when to start an action to foreclose and, as part of that process, take the necessary steps to foreclose on delinquent properties. N.J.S.A. 54:5-86, -97.1. Lienholders on their own, however, cannot facilitate the collection of delinquent property taxes or create an alternate stream of revenue for the town under the TSL; nor can they transfer title through a tax foreclosure. Local government and private lienholders act jointly in that regard. See Lugar, 457 U.S. at 937; Manhattan, 587 U.S. at 809. And their interdependent actions flow from the statutory scheme the State created -- the TSL. See Lugar, 457 U.S. at 937, 941.

By working in tandem under that framework, local government, as the Nebraska Supreme Court has observed, effectively "delegate[s] to . . . private investors the common governmental function of seizing properties to satisfy a tax debt." Cont'l Res. v. Fair (Fair II), 10 N.W.3d 510, 523 (Neb. 2024).

29

For those reasons, private lienholders acting pursuant to the TSL can be considered state actors.

C.

Plaintiff also argues that any equity foreclosed in this case was not taken for a public use. Plaintiff therefore submits that a tax foreclosure would not run afoul of the Fifth Amendment, which bars the taking of private property "for public use, without just compensation." U.S. Const. amend. V (emphasis added). Plaintiff raises the same argument under the State Constitution. See N.J. Const. art. I, ¶ 20 ("Private property shall not be taken for public use without just compensation . . . first made to the owners.").

The argument is self-defeating because "[a] purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void." Haw. Hous. Auth. v. Midkiff, 467 U.S. 229, 245 (1984). Even if just compensation is paid, "one person's property may not be taken for the benefit of another private person without a justifying public purpose." Thompson v. Consol. Gas Utils. Corp., 300 U.S. 55, 80 (1937).

If a lienholder or anyone else therefore took surplus equity in property for a private use, they could not keep it. In other words, if this case did involve a private use, plaintiff could not hold onto potentially hundreds of

30

thousands of dollars in equity that far exceeded the roughly $33,000 it was owed.

In any event, the TSL does serve a public purpose:  it enables municipalities, in essence, to collect taxes.  See Sonderman v. Remington Constr. Co., Inc., 127 N.J. 96, 109 (1992) ("The primary purpose of the Law is . . . to provide a method for collecting taxes."); Varsolona, 180 N.J. at 617 ("[T]he public policy in this State is to encourage tax sale foreclosure so as to assist municipalities in the collection of delinquent taxes."  (quoting Lonsk v. Pennefather, 168 N.J. Super. 178, 182 (App. Div. 1979))); Bron v. Weintraub, 42 N.J. 87, 91 (1964) ("Contrary to early hostility to [tax] titles, the policy today is to support them, thereby to aid municipalities in raising revenue." (citing the TSL at N.J.S.A. 54:5-85)). And by creating an alternate stream of revenue for delinquent taxes, and providing for tax foreclosures by private lienholders, the TSL enables municipalities "to obtain the payment of . . . taxes without going into the real estate business." Varsolona, 180 N.J. at 618 (quoting Fidelity Union Tr. Co. v. City of Newark, 11 N.J. Super. 205, 208 (Cnty. Ct. 1950)). Raising revenue under the TSL is therefore designed to contribute to the public's general welfare; it is not a taking for a private purpose.

31

The public character of a taking under the TSL is not diminished by the fact that property may be transferred directly to a private entity. See Midkiff, 467 U.S. at 244 ("[G]overnment does not itself have to use property to legitimate the taking; it is only the taking's purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause."); see also Kelo v. City of New London, 545 U.S. 469, 482 (2005) (reaffirming Midkiff).

### D.

Other recent rulings have applied Tyler in similar situations. In 2022, the Nebraska Supreme Court initially upheld a tax certificate scheme that allowed private lienholders to obtain title to tax-delinquent properties. Cont'l Res. v. Fair (Fair I), 971 N.W.2d 313, 316 (Neb. 2022). The Court's ruling, among other things, rejected a claim that the homeowners were entitled to compensation for surplus equity in their property under the Takings Clause. Id. at 323-26. Shortly after Tyler was issued, the United States Supreme Court granted certiorari in Fair I, vacated the judgment, and remanded the case "for further consideration in light of Tyler." 143 S. Ct. 2580 (2023).

On remand, the Nebraska Supreme Court reaffirmed its earlier conclusion that the issuance of a tax deed was not for a private purpose. Fair II, 10 N.W.3d at 517. But the Court reconsidered its finding that homeowners were not entitled to just compensation. Id. at 518. In a detailed opinion, the

32

Court found that homeowners had a protected property interest in the surplus value of their foreclosed property beyond the tax debt. Ibid. The Court also found that private lienholders qualified as state actors when they "obtained a tax deed to . . . property" in light of their "joint action with governmental entities." Id. at 522. As a result, the Court concluded that the private lienholder in the case "was not entitled to judgment" on the homeowner's "claim for just compensation under the Takings Clause." Id. at 526.

On the same day the Nebraska Supreme Court decided Fair II, it also issued a ruling in Nieveen v. TAX 106, 10 N.W.3d 365 (Neb. 2024). The United States Supreme Court had earlier vacated and remanded Nieveen in light of Tyler. 143 S. Ct. 2580 (2023).

Nieveen likewise involved a Takings Clause challenge to the issuance of a tax deed under Nebraska's statutory scheme. Relying heavily on its analysis in Fair II, the Nebraska Supreme Court held that the homeowner had adequately alleged a violation of her Fifth Amendment rights. 10 N.W.3d at 370-71.

## VII.

We hold that the version of the TSL in effect before 2024 runs counter to the principles outlined in Tyler and violates the Takings Clause of the Fifth Amendment.

33

The Takings Clause, by its very terms, is designed to prevent the taking of "private property . . . for public use, without just compensation." U.S. Const. amend. V. As a result, lienholders are entitled to recover debts they are owed -- the value of tax sales certificates they purchased at public auction along with interest and related costs. But they are not entitled to surplus equity in property that exceeds that amount. To the extent the prior version of the TSL deviates from those principles, it does not survive constitutional scrutiny. Property owners challenging a tax foreclosure on direct review therefore have a plausible claim for the value of property taken from them beyond the debt they owe.

Because we resolve this case based on the Fifth Amendment, which applies to the States through the Fourteenth Amendment, we need not consider whether different language in the State Constitution provides greater protection to property owners. See N.J. Const. art. I, ¶ 20.[4]

---

[4] Amici raise other arguments that this case does not present. For that reason, we do not address them. See O'Driscoll, 215 N.J. at 479. Specifically, we make no finding about whether today's ruling extends to in rem foreclosures of abandoned property -- an issue the Attorney General, citing Texaco, Inc. v. Short, 454 U.S. 516 (1982), has raised. Nor do we address the Attorney General's thoughtful argument that the entity that forecloses and takes surplus equity should be required to pay any just compensation due, rather than a "non-foreclosing" municipality. Finally, we decline to address Invest Newark's request that the Court adopt a rebuttable presumption that no equity exists in vacant, abandoned, or deteriorating properties. Those issues are best resolved in later disputes among adverse parties.

34

## VIII.

For the reasons outlined above, we affirm as modified the judgment of

the Appellate Division.


JUSTICES PATTERSON, WAINER APTER, FASCIALE, and
NORIEGA join in CHIEF JUSTICE RABNER's opinion.  JUSTICE PIERRE-
LOUIS did not participate.

ANNUAL BORROWER STATEMENT
FOR TAX REPORTING 12/31

| INVESTORS BANK | FORM 1098 - MORTGAGE INTEREST STATEMENT |
| 101 JFK PARKWAY | OMB# 1545-0901 |
| SHORT HILLS NJ 07078 | |
| 1-800-252-8119 | |

PAYER/BORROWER TAX ID        RECIPIENT TAX ID
     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                 22-1368780

CHERYL ACKERMAN
368 RIDGEWOOD AVE            ACCOUNT NUMBER        OLD ACCOUNT NO.
GLEN RIDGE, NJ  07028          19-032615-7

                             NOTE DATE     BRANCH     PSV/INV
                              8/11/09       083          /

| ----TRANSACTION---- | | | TRANSACTION | LATE | INTEREST | ESCROW | PRINCIPAL | PRINCIPAL |
| DATE | CODE | AMOUNT | DESCRIPTION | CHARGE | AMOUNT | AMOUNT | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | BEG BALANCES | | | 13,919.05 | | 600,988.39 |
| 01/27 | 252 | 9,106.18- | GLEN RIDGE | .00 | .00 | 9,106.18- | .00 | 600,988.39 |
| 01/27 | 211 | 6,165.78 | REGULAR PMT | .00 | 2,691.93 | 2,733.15 | 740.70- | 600,247.69 |
| 03/02 | 211 | 6,165.00 | REGULAR PMT | .00 | 2,688.61 | 2,733.15 | 743.24- | 599,504.45 |
| 03/28 | 211 | 500.00 | REGULAR PMT | .00 | 500.00 | .00 | .00 | 599,504.45 |
| 03/28 | 211 | 5,665.00 | REGULAR PMT | .00 | 2,185.28 | 2,733.15 | 746.57- | 598,757.88 |
| 04/25 | 211 | 6,165.78 | REGULAR PMT | .00 | 2,681.94 | 2,733.15 | 750.69- | 598,007.19 |
| 04/26 | 252 | 9,106.18- | GLEN RIDGE | .00 | .00 | 9,106.18- | .00 | 598,007.19 |
| 05/28 | 211 | 6,165.78 | REGULAR PMT | .00 | 2,678.57 | 2,733.15 | 754.06- | 597,253.13 |
| 07/27 | 252 | 7,311.32- | GLEN RIDGE | .00 | .00 | 7,311.32- | .00 | 597,253.13 |
| 07/27 | 211 | 6,165.78 | REGULAR PMT | .00 | 2,675.20 | 2,733.15 | 757.43- | 596,495.70 |
| 08/27 | 211 | 6,165.78 | REGULAR PMT | .00 | 2,671.80 | 2,733.15 | 760.83- | 595,734.87 |
| 09/26 | 211 | 2,500.00 | REGULAR PMT | .00 | 2,500.00 | .00 | .00 | 595,734.87 |
| 09/26 | 203 | 2,500.00- | PAYMENT RVSL | .00 | 2,500.00- | .00 | .00 | 595,734.87 |
| 09/26 | 211 | 6,165.78 | REGULAR PMT | .00 | 2,668.40 | 2,733.15 | 764.23- | 594,970.64 |
| 10/25 | 252 | 7,124.32- | GLEN RIDGE | .00 | .00 | 7,124.32- | .00 | 594,970.64 |
| 10/28 | 211 | 6,165.78 | REGULAR PMT | .00 | 2,664.97 | 2,733.15 | 767.66- | 594,202.98 |
| 11/22 | 833 | 2,971.01- | PRN CURT RVSL | .00 | .00 | .00 | 2,971.01 | 597,173.99 |
| 11/29 | 211 | 6,165.78 | REGULAR PMT | .00 | 2,674.84 | 2,733.15 | 757.79- | 596,416.20 |
| 12/20 | 242 | 2,971.01 | PRIN CURTAIL | .00 | .00 | .00 | 2,971.01- | 593,445.19 |
| 12/29 | 211 | 5,998.57 | REGULAR PMT | .00 | 2,658.14 | 2,565.94 | 774.49- | 592,670.70 |

| L/C PAID | L/C DUE | INT PAID | TAX PAID | INS PAID | PHI PAID | ESCROW BAL | PRINCIPAL BAL |
|---|---|---|---|---|---|---|---|
| .00 | 171.63- | 29,439.68 | 32,648.00 | .00 | .00 | 11,168.49 | 592,670.70 |

| | |
|---|---|
| BOX 1 - MORTGAGE INTEREST RECEIVED FROM PAYER/BORROWER FOR TAX REPORTING | 29,439.68 |
| BOX 2 - POINTS PAID ON PURCHASE OF PRINCIPAL RESIDENCE FOR TAX REPORTING | .00 |
| BOX 3 - REFUND OF OVERPAID INTEREST FOR TAX REPORTING | .00 |
| BOX 4 - MORTGAGE INSURANCE PREMIUMS FOR TAX REPORTING | .00 |
| OTHER - | |

ANNUAL BORROWER STATEMENT
FOR TAX YEAR 12/31

INVESTORS SAVINGS BANK
101 JFK PARKWAY
SHORT HILLS NJ 07078
1-800-252-8119

CHERYL ACKERMAN
368 RIDGEWOOD AVE
GLEN RIDGE, NJ  07028

FORM 1098 - MORTGAGE INTEREST STATEMENT
OMB# 1545-0901

| PAYER/BORROWER TAX ID | RECIPIENT TAX ID |
|---|---|
| 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 | 22-1368780 |

| ACCOUNT NUMBER | OLD ACCOUNT NO. |
|---|---|
| 19-032615-7 | |

| NOTE DATE | BRANCH | PSV/INV |
|---|---|---|
| 8/11/09 | 083 | / |

| DATE | CODE | AMOUNT | TRANSACTION DESCRIPTION | LATE CHARGE | INTEREST AMOUNT | ESCROW AMOUNT | PRINCIPAL AMOUNT | PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | BEG BALANCES | | | 8,532.00 | | 604,624.23 |
| 01/25 | 252 | 8,695.82- | GLEN RIDGE | .00 | .00 | 8,695.82- | .00 | 604,624.23 |
| 01/29 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,708.21 | 2,938.48 | 724.42- | 603,899.81 |
| 01/29 | 833 | 6,305.83- | PRN CURT RVSL | .00 | .00 | .00 | 6,305.83 | 610,205.64 |
| 01/29 | 710 | 6,305.83 | REGULAR PMT | .00 | 2,733.21 | 2,938.48 | 634.14- | 609,571.50 |
| 03/01 | 211 | 6,436.39 | REGULAR PMT | .00 | 2,730.08 | 2,938.48 | 767.83- | 608,803.67 |
| 04/01 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,726.93 | 2,938.48 | 705.70- | 608,097.97 |
| 04/22 | 252 | 8,695.82- | GLEN RIDGE | .00 | .00 | 8,695.82- | .00 | 608,097.97 |
| 04/28 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,723.77 | 2,938.48 | 708.86- | 607,389.11 |
| 06/01 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,720.60 | 2,938.48 | 712.03- | 606,677.08 |
| 06/30 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,717.41 | 2,938.48 | 715.22- | 605,961.86 |
| 06/30 | 242 | 20.00 | PRIN CURTAIL | .00 | .00 | .00 | 20.00- | 605,941.86 |
| 07/26 | 252 | 9,372.44- | GLEN RIDGE | .00 | .00 | 9,372.44- | .00 | 605,941.86 |
| 07/30 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,714.11 | 2,938.48 | 718.52- | 605,223.34 |
| 07/30 | 242 | 379.89 | PRIN CURTAIL | .00 | .00 | .00 | 379.89- | 604,843.45 |
| 08/30 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,709.19 | 2,938.48 | 723.44- | 604,120.01 |
| 09/30 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,705.95 | 2,938.48 | 726.68- | 603,393.33 |
| 10/23 | 211 | 1,671.11 | REGULAR PMT | .00 | 1,671.11 | .00 | .00 | 603,393.33 |
| 10/23 | 203 | 1,671.11- | PAYMENT RVSL | .00 | 1,671.11- | .00 | .00 | 603,393.33 |
| 10/23 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,702.70 | 2,938.48 | 729.93- | 602,663.40 |
| 10/26 | 252 | 5,212.92- | GLEN RIDGE | .00 | .00 | 5,212.92- | .00 | 602,663.40 |
| 11/29 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,699.43 | 2,938.48 | 733.20- | 601,930.20 |
| 11/30 | 269 | 630.86- | ESCROW REFUND | .00 | .00 | 630.86- | .00 | 601,930.20 |
| 12/31 | 211 | 6,165.78 | REGULAR PMT | .00 | 2,696.15 | 2,733.15 | 736.48- | 601,193.72 |
| 12/31 | 242 | 205.33 | PRIN CURTAIL | .00 | .00 | .00 | 205.33- | 600,988.39 |

| L/C PAID | L/C DUE | INT PAID | TAX PAID | INS PAID | PMI PAID | ESCROW BAL | PRINCIPAL BAL |
|---|---|---|---|---|---|---|---|
| .00 | .00 | 35,287.74 | 31,977.00 | .00 | .00 | 13,919.05 | 600,988.39 |

BOX 1 - MORTGAGE INTEREST RECEIVED FROM PAYER/BORROWER FOR TAX REPORTING   35,287.74
BOX 2 - POINTS PAID ON PURCHASE OF PRINCIPAL RESIDENCE FOR TAX REPORTING   .00
BOX 3 - REFUND OF OVERPAID INTEREST FOR TAX REPORTING   .00
BOX 4 - MORTGAGE INSURANCE PREMIUMS FOR TAX REPORTING   .00
OTHER -

INVESTORS BANK
101 WOOD AVENUE SOUTH
ISELIN, NJ 07078
1-855-422-6548

CHERYL ACKERMAN
368 RIDGEWOOD AVE
GLEN RIDGE, NJ  07028

FORM 1098 - MORTGAGE INTEREST STATEMENT
OMB# 1545-0901

| PAYER/BORROWER TAX ID | RECIPIENT TAX ID |
|---|---|
| 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 | 22-1368780 |

| ACCOUNT NUMBER | OLD ACCOUNT NO. |
|---|---|
| 19-032615-7 | |

| NOTE DATE | BRANCH | PSV/INV |
|---|---|---|
| 8/11/09 | 083 | / |

| DATE | CODE | AMOUNT | TRANSACTION DESCRIPTION | LATE CHARGE | INTEREST AMOUNT | ESCROW AMOUNT | PRINCIPAL AMOUNT | PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | BEG BALANCES | | | 8,398.77 | | 584,662.05 |
| 01/07 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,131.58 | 2,843.59 | 963.89- | 583,698.16 |
| 01/28 | 252 | 8,390.25- | GLEN RIDGE TW | .00 | .00 | 8,390.25- | .00 | 583,698.16 |
| 02/08 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,128.07 | 2,843.59 | 967.40- | 582,730.76 |
| 03/12 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,124.54 | 2,843.59 | 970.93- | 581,759.83 |
| 03/30 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,121.00 | 2,843.59 | 974.47- | 580,785.36 |
| 04/24 | 252 | 8,390.25- | GLEN RIDGE TW | .00 | .00 | 8,390.25- | .00 | 580,785.36 |
| 05/09 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,117.45 | 2,843.59 | 978.02- | 579,807.34 |
| 06/11 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,113.88 | 2,843.59 | 981.59- | 578,825.75 |
| 07/09 | 211 | 5,937.06 | REGULAR PMT | .00 | 2,110.30 | 2,843.59 | 983.17- | 577,842.58 |
| 07/15 | 252 | 8,482.55- | GLEN RIDGE TW | .00 | .00 | 8,482.55- | .00 | 577,842.58 |
| 08/06 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,106.72 | 2,843.59 | 988.75- | 576,853.83 |
| 09/06 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,103.11 | 2,843.59 | 992.36- | 575,861.47 |
| 09/28 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,099.49 | 2,843.59 | 995.98- | 574,865.49 |
| 10/21 | 252 | 8,765.51- | GLEN RIDGE TW | .00 | .00 | 8,765.51- | .00 | 574,865.49 |
| 11/05 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,095.86 | 2,843.59 | 999.61- | 573,865.88 |
| 12/02 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,092.22 | 2,843.59 | 1,003.25- | 572,862.63 |

| L/C PAID | L/C DUE | INT PAID | TAX PAID | INS PAID | PMI PAID | ESCROW BAL | PRINCIPAL BAL |
|---|---|---|---|---|---|---|---|
| .00 | .00 | 25,344.22 | 34,028.56 | .00 | .00 | 8,493.29 | 572,862.63 |

BOX 1 - MORTGAGE INTEREST RECEIVED FROM PAYER/BORROWER FOR TAX REPORTING       25,344.22
BOX 2 - POINTS PAID ON PURCHASE OF PRINCIPAL RESIDENCE FOR TAX REPORTING            .00
BOX 3 - REFUND OF OVERPAID INTEREST FOR TAX REPORTING                               .00
BOX 4 - MORTGAGE INSURANCE PREMIUMS FOR TAX REPORTING                               .00
OTHER -

ANNUAL BORROWER STATEMENT
FOR TAX DOCUMENT 12/31/09

22-019032615-7

INVESTORS BANK
101 WOOD AVENUE SOUTH
ISELIN, NJ 07078
1-855-422-6548

FORM 1098 - MORTGAGE INTEREST STATEMENT
OMB# 1545-0901

| PAYER/BORROWER TAX ID | RECIPIENT TAX ID |
|---|---|
| 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 | 22-1368780 |

CHERYL ACKERMAN
368 RIDGEWOOD AVE
GLEN RIDGE, NJ  07028

| ACCOUNT NUMBER | OLD ACCOUNT NO. |
|---|---|
| 19-032615-7 | |

| NOTE DATE | BRANCH | PSV/INV |
|---|---|---|
| 8/11/09 | 083 | / |

| DATE | CODE | AMOUNT | TRANSACTION DESCRIPTION | LATE CHARGE | INTEREST AMOUNT | ESCROW AMOUNT | PRINCIPAL AMOUNT | PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | BEG BALANCES | | | 8,398.77 | | 584,662.05 |
| 01/07 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,131.58 | 2,843.59 | 963.89- | 583,698.16 |
| 01/28 | 252 | 8,390.25- | GLEN RIDGE TW | .00 | .00 | 8,390.25- | .00 | 583,698.16 |
| 02/08 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,128.07 | 2,843.59 | 967.40- | 582,730.76 |
| 03/12 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,124.54 | 2,843.59 | 970.93- | 581,759.83 |
| 03/30 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,121.00 | 2,843.59 | 974.47- | 580,785.36 |
| 04/24 | 252 | 8,390.25- | GLEN RIDGE TW | .00 | .00 | 8,390.25- | .00 | 580,785.36 |
| 05/09 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,117.45 | 2,843.59 | 978.02- | 579,807.34 |
| 06/11 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,113.88 | 2,843.59 | 981.59- | 578,825.75 |
| 07/09 | 211 | 5,937.06 | REGULAR PMT | .00 | 2,110.30 | 2,843.59 | 983.17- | 577,842.58 |
| 07/15 | 252 | 8,482.55- | GLEN RIDGE TW | .00 | .00 | 8,482.55- | .00 | 577,842.58 |
| 08/06 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,106.72 | 2,843.59 | 988.75- | 576,853.83 |
| 09/06 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,103.11 | 2,843.59 | 992.36- | 575,861.47 |
| 09/28 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,099.49 | 2,843.59 | 995.98- | 574,865.49 |
| 10/21 | 252 | 8,765.51- | GLEN RIDGE TW | .00 | .00 | 8,765.51- | .00 | 574,865.49 |
| 11/05 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,095.86 | 2,843.59 | 999.61- | 573,865.88 |
| 12/02 | 211 | 5,939.06 | REGULAR PMT | .00 | 2,092.22 | 2,843.59 | 1,003.25- | 572,862.63 |

| L/C PAID | L/C DUE | INT PAID | TAX PAID | INS PAID | PMI PAID | ESCROW BAL | PRINCIPAL BAL |
|---|---|---|---|---|---|---|---|
| .00 | .00 | 25,344.22 | 34,028.56 | .00 | .00 | 8,493.29 | 572,862.63 |

BOX 1 - MORTGAGE INTEREST RECEIVED FROM PAYER/BORROWER FOR TAX REPORTING    25,344.22
BOX 2 - POINTS PAID ON PURCHASE OF PRINCIPAL RESIDENCE FOR TAX REPORTING    .00
BOX 3 - REFUND OF OVERPAID INTEREST FOR TAX REPORTING    .00
BOX 4 - MORTGAGE INSURANCE PREMIUMS FOR TAX REPORTING    .00
OTHER -



Map data ©2021 Im

1 of 7

6 bd   6 ba   4,853 sqft

368 Ridgewood Ave, Glen Ridge, NJ 07028

Sold: $1,025,000   Sold on 06/29/18   Zestim

Est. refi payment: $5,842/mo  Refinance your l

Home value   Owner tools   Home details   Neig

## Home value

Share Your Feedback

**Watch your Zestimate**

Do you own this home? Track trends

receive local market insights for hon

**Get homeowner insights**

*[handwritten:]* My pravius hme tday – market aolyus $1,525/35,000   market value 2021



Zestimate

# $1,525,9

Zestimate ran

**$1.37M - $**

Last 30-day ch

**+ $48,886**

Zestimate per

**$314**

ANNUAL BORROWER STATEMENT
FOR TAX YEAR ENDING: 12/31/09

22-1219032615?

INVESTORS SAVINGS BANK
101 JFK PARKWAY
SHORT HILLS NJ 07078
1-800-252-8119

FORM 1098 - MORTGAGE INTEREST STATEMENT
OMB# 1545-0901

PAYER/BORROWER TAX ID        RECIPIENT TAX ID
   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                   22-1368780

CHERYL ACKERMAN
368 RIDGEWOOD AVE
GLEN RIDGE, NJ   07028

ACCOUNT NUMBER        OLD ACCOUNT NO.
  19-032615-7

| | | NOTE DATE | BRANCH | PSV/INV |
| | | 8/11/09 | 083 | / |

| -----TRANSACTION----- | | | TRANSACTION | LATE | INTEREST | ESCROW | PRINCIPAL | PRINCIPAL |
| DATE | CODE | AMOUNT | DESCRIPTION | CHARGE | AMOUNT | AMOUNT | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| | | | BEG BALANCES | | | 8,532.00 | | 604,624.23 |
| 01/25 | 252 | 8,695.82- | GLEN RIDGE | .00 | .00 | 8,695.82- | .00 | 604,624.23 |
| 01/29 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,708.21 | 2,938.48 | 724.42- | 603,899.81 |
| 01/29 | 833 | 6,305.83- | PRN CURT RVSL | .00 | .00 | .00 | 6,305.83 | 610,205.64 |
| 01/29 | 710 | 6,305.83 | REGULAR PMT | .00 | 2,733.21 | 2,938.48 | 634.14- | 609,571.50 |
| 03/01 | 211 | 6,436.39 | REGULAR PMT | .00 | 2,730.08 | 2,938.48 | 767.83- | 608,803.67 |
| 04/01 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,726.93 | 2,938.48 | 705.70- | 608,097.97 |
| 04/22 | 252 | 8,695.82- | GLEN RIDGE | .00 | .00 | 8,695.82- | .00 | 608,097.97 |
| 04/28 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,723.77 | 2,938.48 | 708.86- | 607,389.11 |
| 06/01 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,720.60 | 2,938.48 | 712.03- | 606,677.08 |
| 06/30 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,717.41 | 2,938.48 | 715.22- | 605,961.86 |
| 06/30 | 242 | 20.00 | PRIN CURTAIL | .00 | .00 | .00 | 20.00- | 605,941.86 |
| 07/26 | 252 | 9,372.44- | GLEN RIDGE | .00 | .00 | 9,372.44- | .00 | 605,941.86 |
| 07/30 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,714.11 | 2,938.48 | 718.52- | 605,223.34 |
| 07/30 | 242 | 379.89 | PRIN CURTAIL | .00 | .00 | .00 | 379.89- | 604,843.45 |
| 08/30 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,709.19 | 2,938.48 | 723.44- | 604,120.01 |
| 09/30 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,705.95 | 2,938.48 | 726.68- | 603,393.33 |
| 10/23 | 211 | 1,671.11 | REGULAR PMT | .00 | 1,671.11 | .00 | .00 | 603,393.33 |
| 10/23 | 203 | 1,671.11- | PAYMENT RVSL | .00 | 1,671.11- | .00 | .00 | 603,393.33 |
| 10/23 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,702.70 | 2,938.48 | 729.93- | 602,663.40 |
| 10/26 | 252 | 5,212.92- | GLEN RIDGE | .00 | .00 | 5,212.92- | .00 | 602,663.40 |
| 11/29 | 211 | 6,371.11 | REGULAR PMT | .00 | 2,699.43 | 2,938.48 | 733.20- | 601,930.20 |
| 11/30 | 269 | 630.86- | ESCROW REFUND | .00 | .00 | 630.86- | .00 | 601,930.20 |
| 12/31 | 211 | 6,165.78 | REGULAR PMT | .00 | 2,696.15 | 2,733.15 | 736.48- | 601,193.72 |
| 12/31 | 242 | 205.33 | PRIN CURTAIL | .00 | .00 | .00 | 205.33- | 600,988.39 |

| L/C PAID | L/C DUE | INT PAID | TAX PAID | INS PAID | PMI PAID | ESCROW BAL | PRINCIPAL BAL |
|---|---|---|---|---|---|---|---|
| .00 | .00 | 35,287.74 | 31,977.00 | .00 | .00 | 13,919.05 | 600,988.39 |

BOX 1 - MORTGAGE INTEREST RECEIVED FROM PAYER/BORROWER FOR TAX REPORTING        35,287.74
BOX 2 - POINTS PAID ON PURCHASE OF PRINCIPAL RESIDENCE FOR TAX REPORTING           .00
BOX 3 - REFUND OF OVERPAID INTEREST FOR TAX REPORTING                              .00
BOX 4 - MORTGAGE INSURANCE PREMIUMS FOR TAX REPORTING                              .00
OTHER -



# Glen Ridge Police Department

3 Herman Street, Glen Ridge, NJ 07028
Phone: 973-748-5400 Fax: 973-748-2596 Mun. Code: 0708



## Operations Report



### Incident Details

| Case Number | Time Reported | Date Reported | Time Occurred | Date Occurred | Occurrence Between Date / Time of | Time Occurred | Date Occurred | 911 | Completed |
|---|---|---|---|---|---|---|---|---|---|
| 8-18687 | 20:06 | 06/11/18 | 20:06 | 06/11/18 | | | | | X |

### Incident Type / Incident Location

Civil Complaint

| Street # | Street Name | Intersection / Cross Street of: |
|---|---|---|
| 368 | Ridgewood Avenue | |

Business / Common Location Name

### General Information - Victim, Suspect, Complainant, Witness, Driver, Arrest, Passenger, Missing, Business Owner

| Code | Contact Name #1 | MI | Suffix | Age | Sex | Race | DOB | SSN |
|---|---|---|---|---|---|---|---|---|
| C | Ackerman, Cheryl | | | | F | 1B | | |

Address: 368 Ridgewood Ave, Glen Ridge, NJ 07028-1513

Home Phone / Cell Phone

| Code | Contact Name #2 | MI | Suffix | Age | Sex | Race | DOB | SSN |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Address | Home Phone | Cell Phone

| Code | Contact Name #3 | MI | Suffix | Age | Sex | Race | DOB | SSN |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Address | Home Phone | Cell Phone

| Code | Contact Name #4 | MI | Suffix | Age | Sex | Race | DOB | SSN |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Address | Home Phone | Cell Phone

### Property Information

| | Currency | Jewelry | Furs | Clothing | Auto | Misc. | Total |
|---|---|---|---|---|---|---|---|
| Value of Stolen Property | | | | | | | |
| Value of Stolen Property Recovered | | | | | | | |

### Automobile Information

| Vehicle Code | Year | Make | Body Type | Color | Registration | State | VIN |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

### Narrative

On June, 11 2018 I, Officer Perigo, responded to headquarters to speak with Ms. Cheryl Ackerman regarding her recent eviction from her residence located at 368 Ridgewood Avenue. Ms. Ackerman reported that she recently went to Bankruptcy Court and Judge Rosemary Gambardella made a ruling that she vacate her house on June 4, 2018. Ms. Ackerman then went on to advise me that on June 8, 2018 she drove past her house and observed various people there including a "Shred-It" truck. Ms. Ackerman reported that the workers were shredding her patient's medical files. She explained that nobody should be at her residence other than the realtors showing the house. She further stated that it is illegal for anyone to be touching and or looking at her patient's medical records which are all stored at her house.

### Officer of Record / Date / Other Reports Filed / Reviewed By

Ptl. Matthew Perigo 110   06/11/18

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| MVA | Arrest | DV | DWI | DWIQ | Tow | SD | CI | TRO | |
| SHA | Prop. | Evdn | UOF | Prst | Supp | Juv | Bias | Pris | 104 |